JULIA M. JAYNE (State Bar No. 202753)
E-Mail: *julia@jaynelawgroup.com*
JAYNE LAW GROUP, P.C.
260 California Street, Suite 1001
San Francisco, California 94111
Telephone: (415) 623-3600
Facsimile: (415) 623-3605

Attorneys for Defendant
JESSICA SCOTT

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-514 CRB |
| Plaintiff, | **JESSICA SCOTT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNARD VARIANCE UNDER 18 U.S.C. § 3553(a)** |
| v. | |
| JESSICA SCOTT et al, | |
| Defendant. | Date: July 5, 2017<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer |

LAW OFFICES
J A Y N E   L A W   G R O U P ,   P . C .
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

The Defendant Jessica Scott, through her counsel, Julia M. Jayne, hereby submits the following Sentencing Memorandum in support of her request for imposition of a probationary sentence, to include 200 hours of community service, and all other standard terms and conditions.

## INTRODUCTION

On July 5, 2017, Defendant Jessica Scott will stand before this Court for sentencing. Ms. Scott pled guilty to one count of defrauding the United States. Ms. Scott has no prior conviction or arrest of any kind and has never previously been incarcerated for any reason. However, in this case, due to the weight-driven sentencing guidelines applicable to the controlled substance that passed through airport security while Ms. Scott operated the x-ray machine, Ms. Scott faces an advisory guideline range of 41-51 months[1]. Ms. Scott's guidelines for defrauding the government (without consideration to drug quantity) would otherwise fall at Level 10 (6-12 months, Zone B).

The U.S. Probation Officer provides some arguments in support of a downward variance, recommending a sentence of two years imprisonment. The recommendation of incarceration itself is inconsistent with Ms. Scott's numerous positive attributes cited in the Presentence Report ("PSR"). Thus, for the additional reasons set forth below, it is respectfully submitted that the Court should sentence Ms. Scott to a term of probation, with the added condition of 200 hours of community service. Such a sentence would be sufficient, but not greater than necessary, to fully satisfy the sentencing objectives this Court must consider under 18 U.S.C. § 3553(a).

## PROCEDURAL BACKGROUND

Ms. Scott was indicted on September 14, 2015 and made her initial appearance on November 3, 2015. On March 28, 2017, Ms. Scott pled guilty to a single violation of 18 U.S.C § 371 – conspiracy to defraud the government.

---

[1] This is the guideline range with the two-point reduction for safety valve, which the government opposes. Further discussion below.

2                                        Case No. CR 15-514 CRB
                                          DEFENDANT'S SENTENCING MEMO

LAW OFFICES

JAYNE LAW GROUP, P.C.

260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

**DISCUSSION**

I.      **FACTUAL BACKGROUND AND HISTORY**

      A.  **Background of Ms. Scott**

Ms. Scott is 29 years old. She was born in San Francisco and grew up in the Bay Area, where she has lived her entire life. While she grew up with a very repressive, strict, and at times, abusive mother, she tried to make the most of her upbringing by spending time with her father, her aunt, and her siblings. PSR ¶ 38-40. Ms. Scott finished high school and attended some college. She was well into her career in airport security at SFO, employed by Covenant Aviation Security ("CAS") which she hoped would launch her into high-level government or military work, when the instant case occurred, which was in 2013. PSR ¶ 16. Ms. Scott, as attested to by her former supervisor at CAS, was dependable and took her position seriously. *See* Declaration of Julia M. Jayne ("Jayne Decl."), Exhibit A, letters. In fact, everything in her life, up to the point of the instant offense, was on the straight and narrow. No one who knows Ms. Scott can fathom her being part of the criminal justice system. As the numerous letters attached to this Sentencing Memorandum demonstrate, Ms. Scott is loved and respected by many people in her family and community who find it inconceivable how she could have ended up in this situation. *Id.* They describe her as responsible, having integrity, kind, honest and hard-working.

Indeed, Ms. Scott is no stranger to hard work, as she began working for CAS shortly after high school. She worked her way up, eventually to supervisor in 2015, and was well-respected by her peers and employer. Other than this incident, which resulted from placing false trust in her husband at the time, she was a law-abiding and excellent employee. Since she was let go from her job at CAS, she has continued to stay employed, despite many hardships and setbacks in finding work with a pending federal felony. She was turned down for several low-level jobs when the prospective employer learned of the instant case. Her conviction here will indeed stand in the way of many of her aspirations, but she intends on working hard to make it on her own merits. *See* Jayne Decl., Exh. C.

1    Overall, this offense was a complete aberration to every other aspect of Ms. Scott's life.

2    She has never been arrested, has never tried serious drugs, and has tried to live a moral, honest and

3    dignified life.

4                    **B.  The Offense Conduct**

5    So how does a person described to be ethical, hard-working and law-abiding end up in the

6    current situation: facing sentencing for a federal felony conviction? In Ms. Scott's case, it is

7    because of misplaced trust in her (former) spouse and her regrettable mistake of not ending the

8    relationship sooner. Had it not been for her love for Joseph Scott, Ms. Scott would *never* have

9    ended up in this predicament. By agreeing to let Joseph Scott's "friend" through the security line

10   without a secondary bag check, Ms. Scott's allowed herself to look the other way, despite her

11   better judgment. Although she did not believe her husband would have ever placed her in a

12   position of danger or in the middle of a criminal operation, she nonetheless made the mistake of

13   turning a blind eye to what she later learned from law enforcement agents were drugs passing

14   through security at SFO.

15   Prior to the instant offense, Ms. Scott began to notice that her husband, Joseph Scott,

16   seemed to be keeping things from her. He would go out and refuse to tell her where he was going,

17   he met with people she didn't know without explanation, he had excess cash, and he began

18   behaving in a suspicious manner. *See* Jayne Decl., Exh. C. So Ms. Scott began to question him

19   repeatedly regarding his whereabouts and activities. In each instance, he told her not to worry

20   about it. She continued to worry and continued to interrogate him, but he refused to tell her

21   anything other than "don't worry." So she tried not to worry, knowing that Joseph Scott was a man

22   of intelligence, integrity, and responsible for several children. For a while, the idea that he was

23   involved in any sort of criminal activity was the furthest thing from her mind, because she knew

24   her husband to be a good person who wouldn't put her in a compromising position. She wouldn't

25   have married him had she believed otherwise.

26   And so when Joseph Scott told her his friend was coming to the airport and that his bag

27                                        4                    Case No. CR 15-514 CRB
                                        DEFENDANT'S SENTENCING MEMO

28

was "good," Ms. Scott didn't object to letting the individual's bag pass through. When the "friend" came through security, she didn't give his bag the scrutiny she should have. Of course, she was *not* aware of the contents of the bag[2], but the coloring on the on the x-ray machine should have triggered a secondary check and, as attested to in her plea agreement, she could have reasonably determined the bag contained some illegal substance based on Joseph Scott's suspicious behavior.[3]

Instead, she noticed a soda can and requested that this be removed. To some extent, sitting there at the x-ray machine, Ms. Scott was on auto pilot. Like many CAS and TSA employees, they were instructed to work fast, to get as many passengers through as possible and not to hold up the lines unnecessarily. And like other employees, Ms. Scott was never trained to look for controlled substances – only explosives and weapons. The training, many years ago when Ms. Scott began, in hindsight, was negligible. Employees were encouraged to be efficient and not hold the lines up, and only be on the lookout for the most obvious offensive items (liquids, explosives, sharp objects, etc). Thus, because she was attempting to be an efficient employee, it is possible that Joseph Scott, or even co-defendant Michael Castaneda (whom she wasn't close friends with and never knew to be involved in anything) took advantage of this by sending controlled substances through the x-ray machine when she was on deck. Of course, the investigation revealed that numerous other airport employees, perhaps unknowingly, allowed controlled substances to pass through security as well, but because Ms. Scott was married to Joseph Scott, she was arrested and charged. *Many others were not*. Thus, were it not for their marital status, Ms. Scott could easily

---

[2] Ms. Scott would not have known whether the bag contained marijuana, cocaine, or some other drug.

[3] On the prior alleged instances cited by Probation, the coloring of the bags was also consistent with legal substances such as organic materials. The items did not stand out, and Ms. Scott was not asked to be on the lookout for anyone. She was doing her job, like so many other CAS employees, by whisking bags through security. Also, the test-runs by agents of controlled substances through the x-ray machines does not necessarily reflect how the bags looked while passing through the x-ray machine on a given day, because of the various other items in the bags or suitcases, the angle at which bags passed through, etc.

Case No. CR 15-514 CRB
DEFENDANT'S SENTENCING MEMO

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 California Street, Suite 1001
SAN FRANCISCO, CALIFORNIA 94111

have been viewed as another employee not paying very close attention and trying to get passengers efficiently through the checkpoint, which is exactly what she was doing. Ms. Scott would have never intentionally placed anybody at risk and had she actually suspected a risk to public safety, she would have taken action to protect the public. Nor did she suspect her ex-husband would ask her to compromise public safety.

Alas, because the "good" bag contained cocaine, Ms. Scott is facing this Court. But it bears emphasis that she was never informed of the contents, was never told about a conspiracy, never received any money, and never actually knew the details of what Joseph Scott was involved in. She had her suspicions and therefore, a few months after this incident, Jessica Scott ended the marriage with Joseph Scott. Tired of his secrecy and disappointed that he wasn't being forthright in their marriage, she sought separation and thereafter, divorce. PSR ¶ 41. Her critical mistake was not pursuing separation several months earlier. Her life would have ended up in a completely different place had she come to this conclusion sooner.

Since her arrest, Ms. Scott has not only had a difficult time on the employment front, but she has also suffered psychologically and emotionally. *See* Jayne Decl., Exh. C. The reality of criminal charges and the possibility of going to prison, plus betrayal by her husband, sent her into a deep depression. Fortunately, Ms. Scott was wise enough to realize she needed help, and has consistently attended therapy and is doing better. She is also now in a healthy relationship and is engaged to be married.

Unfortunately, her job prospects as a result of a felony conviction have been slim. Instead of making a significant salary working at the airport, she is now making minimum wage[4]. PSR ¶ 50. Prior to this job, she had been turned down for many low-level jobs and even had to quit her EMT program due to the criminal case. *Id.*

---

[4] As of the writing of this sentencing memo, Ms. Scott has obtained employment as a store manager at Starbucks. She previously worked at Amazon as a stock-fulfillment person.

Case No. CR 15-514 CRB
DEFENDANT'S SENTENCING MEMO

LAW OFFICES

JAYNE LAW GROUP, P.C.

260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

### C.  Objections to P.S.R.

Ms. Scott makes the following objections to the Final Presentence Report:

Paragraphs 13 and 19:

Ms. Scott objects to the conclusion by Probation that she is responsible for 17 kilograms of cocaine. Ms. Scott was only told by Joseph Scott on one instance, on July 18, 2013, that a bag was "good." In the other instances, she did not have any knowledge and if anything passed through, it was inadvertent. Moreover, the coloring of the substances on the prior occasions was also consistent with legal substances and is debatable whether a secondary bag check should have occurred.

Page 18, Paragraph 6:

Ms. Scott objects to the probation officer's conclusion that she is not eligible for a two-point safety valve reduction. This is discussed below.

### D.  Ms. Scott Qualifies for a Two-Point Reduction for Safety Valve

On April 17, 2017, Ms. Scott, with counsel, sat down for a meeting with AUSA Laura Vartain Horn and federal agents from the FBI, DEA, and TSA. *See* Jayne. Decl. In that meeting, Ms. Scott answered all of their questions and conveyed everything she knew about the situation at the airport during her employment. *Id.* She admitted responsibility, volunteered information, and was truthful. *Id.* Moreover, her answers were consistent with the factual basis in her plea agreement, in which she admitted that she was aware that Mr. Scott's friend's bag should not be subject to a secondary bag check, while being aware of the high probability that the bag contained a controlled substance.

Pursuant to U.S.S.G. § 5C1.2, Ms. Scott meets the "safety valve" criteria. She does not have any criminal history points, she did not use violence, the offense did not result in injury to anyone, and the defendant was not an organizer or leader in the offense. And prior to sentencing, Ms. Scott met with the government and truthfully provided all information and evidence she had regarding the offense. The guideline further states that where the defendant has no useful or

relevant information, it shall not preclude a determination by the Court that the defendant has complied with the requirements. Indeed, in this case, Mr. Scott had limited information, because she was never privy to incriminating evidence. She conveyed all that she knew and should not be penalized for not knowing more.

Thus, in spite of the government's anticipated objection to the application of the safety valve deduction, Ms. Scott would ask this Court to find that she *does* qualify for the reasons described herein. Should the Court require more information and inquiry, Counsel would request an evidentiary hearing to determine the truthfulness and completeness of Ms. Scott's information. Alternatively, counsel can expand upon her proffer to the government in a sealed courtroom or an under-seal declaration, if the Court so desires.

Specifically, the government may assert that Ms. Scott is not entitled to the safety valve reduction because of a single point on which the parties disagree: whether Ms. Scott asked to be placed on the x-ray machine or not during one of the instances drugs passed through security. The government disbelieves that Ms. Scott did not ask to be placed on the machine, and instead puts great weight on the statement of its cooperating co-defendant. Not only was that person inconsistent in his statement about whether Ms. Scott asked to be on the machine, but because he has much to gain, his exaggerated statement regarding Ms. Scott should be viewed with suspicion. Furthermore, none of the video surveillance shows Ms. Scott approaching the cooperating defendant to purportedly ask him to be transferred to the x-ray machine.

The government simply has no basis to place more weight on the cooperator's statement than it does on Ms. Scott's. This individual wavered between claiming that Ms. Scott was placed on the x-ray machine because she was "lazy" and kept lines moving, to alleging that she requested to operate the machine. Several of his statements defied credibility, particularly when he claimed that she conspicuously asked him to operate the machine because her husband had "friends"

coming through.[5] No such conversation ever occurred and if it had, it would be captured on video surveillance. Notably, she was not friends with this supervisor, had no idea he was involved in any operation with Mr. Scott (and therefore, wouldn't have risked exposing the operation to her supervisor, *if* had she known about it), nor did she have the authority to dictate her rotations.

Though the government apparently believes a co-defendant's statement that Ms. Scott asked to operate the x-ray machine on a day when she had no idea drugs were being smuggled through the airport, in reality, Ms. Scott had no such authority to upset the flow of rotations. The CAS officers rotated through different positions at airport security as dictated by the supervisor, and rotations occurred approximately every 30 minutes. *See* Attached Exh B, letters from CAS supervisor and former CAS employee. The 30-minute rotation schedule was part of the CAS rule book, and designed to reduce fatigue and complacency. *Id.* The transportation officers such as Ms. Scott had no authority to modify rotations, didn't get to call the shots, didn't get to "ask" to be on a given rotation out of order, as this would have caused everyone else's rotation to be cut short or lengthened and could result in reprimands. *Id.* Thus, Ms. Scott could not have asked to be placed on the x-ray machine, and in fact, was placed there by whatever supervisor was on duty. *Id.* And on July 18, 2013, the date of the incident to which she pled, Ms. Scott was *already* operating the x-ray machine when the undercover agents approached the security checkpoint area.

Moreover, the government may allege that because Ms. Scott was on the x-ray machine when controlled substances passed through security, she must have asked to be there. However, from the discovery provided, it is apparent that at least *seven* other CAS employees allowed drugs to pass through security undetected, and from what it appears, none of them were prosecuted. Like Ms. Scott, they were likely efficient or "lazy" employees who were focused on moving the lines quickly. Ms. Scott, based on her experience, was indeed known as an employee who got

---

[5] He even admitted that if Ms. Scott hadn't been working on a day he was smuggling drugs through the airport, he would have simply asked another "lazy" CAS employee to operate the x-ray machine in order to accomplish his goal.

Case No. CR 15-514 CRB
DEFENDANT'S SENTENCING MEMO

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

1   passengers through the lines without delay. This was what was required – and desired – in a good

2   CAS employee.

3          Notably, the government does not challenge Ms. Scott's lack of knowledge, involvement,

4   or any other aspect of her lengthy safety-valve meeting; only the point regarding whether she

5   asked to be on the machine or not. She admitted her suspicions about her husband's activity,

6   admitted that she should have conducted the secondary bag check, and took responsibility, as

7   outlined in her plea agreement. As a result, the government's denial of safety valve appears to be a

8   distorted effort to deny her the additional two-point reduction. Ms. Scott would ask this Court to

9   find, by a preponderance of the evidence that she has complied with the requirements of safety

10   valve. *United States v. Ajugwo*, 82 F.3d 925, 929 (9th Cir. 1996). The Probation Officer has also

11   left it for the Court to determine eligibility.

12          If the Court does find eligibility for the safety valve, Ms. Scott qualifies for a two-level

13   reduction in her offense level, as outlined in U.S.S.G. § 2D1.1(b)(17). The use notes to this section

14   instruct the Court that its applicability shall be determined without regard to whether the defendant

15   was convicted of an offense that subjects her to a mandatory minimum sentence of imprisonment.

16   *Id.* at use note 21. Ms. Scott volunteered to be interrogated by numerous federal agents and a

17   prosecutor in anticipation of receiving this two-point reduction. She spoke of everything she knew

18   and volunteered information to the government. There is no logical reason to deny her of it when

19   she meets every criteria.

20          Accordingly, Ms. Scott respectfully requests this Court to find that her adjusted offense

21   level, in accordance with her plea agreement, is 22.

22   **II.  THE APPLICABLE GUIDELINE RANGE IS THE "STARTING POINT" AND
     "INITIAL BENCHMARK" FOR THIS COURT**
23

24   **A.  *Gall* and *Kimbrough* Clarified the Vast Discretion of this Court to Impose a
     Below-Guidelines Sentence**

25   In *Gall v. United States*, 128 S. Ct. 586, 598 (2007), and *Kimbrough v. United States*, 128

26   S.Ct. 558 (2007), the Supreme Court set forth the proper analysis that district courts should follow

27                                           10
                                                              Case No. CR 15-514 CRB
                                                              DEFENDANT'S SENTENCING MEMO

28

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

in evaluating a proper sentence in the wake of *United States v. Booker*, 543 U.S. 220 (2005):

> A district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553 (a) factors to determine whether they support the sentence requested by a party. In doing so, he may not presume that the Guideline range is reasonable. He must make an individualized assessment based on all the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

*Gall,* 128 S.Ct. at 596-97 (citations omitted). Moreover, the Court is free to disagree with the Guideline ranges and policy considerations. *See Kimbrough v. United States*, 128 S.Ct. at 558. "It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 598 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). After *Gall*, it is clear that federal district courts possess great discretion on a case-by-case basis in handing down a sentence.

In this case, Ms. Scott is asking this Court not to take a rigid and deferential approach to her advisory guideline range, but rather to depart downward to a more appropriate sentence of 36 months of probation. While such a sentence is below the recommendation by the probation department and below the quantity-driven guidelines, as described below, Ms. Scott hopes that this Court will realize that for a first-time offender such as Ms. Scott it is not only appropriate, but due to the collateral consequences, is already excessively punitive. *See United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (no abuse of discretion in district court departing from a guideline range of 41-51 months to a sentence of probation and community service; court considered collateral consequences and defendant's repentance).

### B. The Ninth Circuit Has Declined to Apply a Presumption of Reasonableness to a Guidelines Sentence

In *United States v. Carty,* 520 F.3d 984 (9th Cir. 2008) (en banc), the Ninth Circuit

JAYNE LAW GROUP, P.C.
LAW OFFICES
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

indicated that "the district court may not presume that the Guideline range is reasonable… nor should the Guidelines factor be given more or less weight than any other." *Id.* at 991 (citations omitted). "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *Id.*, citing *Kimbrough*, 129 S.Ct. at 570; *Gall*, 128 S.Ct. at 594. An appellate court will only review the substantive reasonableness of the district court's decision by considering the "totality of the circumstances" giving, "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* Under *Carty*¸ while this Court must consider the applicable Guideline range, this range is *not* presumptively the correct sentence for Ms. Scott. The Court must consider Ms. Scott as an individual who is entitled to the consideration of the § 3553(a) factors and any decision the Court makes will be granted "due deference" should appellate review ensue.

Moreover, specific characteristics of individual defendants, which district courts were once prohibited or discouraged from considering, may now be considered. *See Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental, or emotional condition, medical condition, employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the guidelines . . . These are, however, matters that section 3553(a) authorizes a sentencing judge to consider"); *United States v. Lazenby* 439 F.3d 928, 933 (8th Cir. 2006) ("the other factors cited by the district court, though discouraged or prohibited departure factors under the mandatory guidelines, may be considered in applying the section 3553(a) factors under *Booker*").

In this case, the following factors warrant a variance from the advisory guidelines:

- Post-Offense Rehabilitation (four years of law-abiding life since the incident; also, therapy).
- Defendant's lesser role in the alleged conspiracy. *United States v. Gomez*, 215 F.App'x 200 (4th Cir. 2007).

Case No. CR 15-514 CRB
DEFENDANT'S SENTENCING MEMO

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

- Defendant had no knowledge of, or control over, amount, type, or purity of drugs. *United States v. Mendoza*, 121 F.3d 510 (9th Cir. 1997) (defendant had no knowledge of or control over the amount or purity of the drugs, and court determined that the facts were outside the heartland of such cases). This is absolutely true for Ms. Scott: she had no knowledge, control or information regarding the contents of the bag that passed through.

- Prison has greater significance for those imprisoned for the first time. *United States v. Paul*, 239 F. Appx 353 (9th Cir. 2007).

- Lengthy period of time since commencement of the offense. Here, four years.

- Lengthy pre-trial supervision (nearly 2 years of pretrial supervision). *United States v. Miller*, 991 F.2d 552, 554 (9th Cir. 1993.

- Defendant's otherwise outstanding character. *United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007).  *See* Jayne Decl., Exh. A.

- Aberrant behavior by the defendant. *See* Section 5K2.20 of the Guidelines and *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008).

- Excellent employment history. *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008).

- Defendant's good deeds and past integrity. *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998).

- Defendant's personal characteristics and the offense were atypical. *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009). Ms. Scott, as evidenced by her lack of criminal history and personal background, certainly does not fit the "typical profile" of a drug offender.

- Positive characteristics such as no history of substance abuse.

- Defendant already punished by collateral consequences such as: public stigmatization, loss of various benefits and citizen rights due to being a felon, loss of financial stability, loss of employment opportunities, loss of educational opportunities.

Given this overall objective, Ms. Scott asks this Court to find that the correct sentence in the instant offense is one which will adequately punish her, but will not contradict the recognized

13

purposes of sentencing and leave her far worse off. Applying these advisory guidelines, the calculation of Ms. Scott's sentence according to the United States Sentence Guidelines (USSG) is: 41-51 months (Level 22), but the appropriate and measured sentence should not include imprisonment.

### IV. A PROBATION TERM WOULD BEST SATISFY THE GOALS ARTICULATED IN § 3553(a)

The Court's duty is to impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing listed in 18 U.S.C. §3553(a)(2). *See Carty,* 520 F.3d at 991. These four purposes are: retribution; general deterrence; specific deterrence; and rehabilitation. 18 U.S.C. § 3553(a)(2)(A)-(D). In "determining the particular sentence to be imposed" the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

### A. Need for Just Punishment in Light of Seriousness of the Offense

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, roles in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Ms. Scott's characteristics and background and her relative involvement is extremely minimal compared to other drug offenses.

### B. Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

(2006). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Thus, a custodial sentence has no statistical or evidentiary value as having a deterrent effect.

In Ms. Scott's case, time in prison is not going to make any difference in deterring Ms. Scott in the future from allowing a controlled substance to pass through the airport. First, she will never work at the airport again, even if she wanted to. Second, she is not a drug user, drug dealer, or someone who has ever been involved in any criminal activity. More importantly, the federal indictment and just the very notion of being a felon unexpectedly and for the first time in her life has made its impact on Ms. Scott; whatever her punishment, she would and could never bring herself from doing anything remotely similar to what occurred in this case. She also is far more distrustful of people close to her, as she believes it was her blind trust in her ex-husband that led her to this situation in the first place.

Accordingly, Ms. Scott presents zero risk of re-offending and a non-custodial sentence, plus all of the collateral consequences, is a significant punishment to adequately promote respect for the law and general deterrence.

**C.  Need to Protect the Public**

Ms. Scott is not a violent criminal. She is not someone with a history of criminal conduct. She is not even someone who would ever break the law again. Protecting the public, in Ms. Scott's case, should be given little weight in evaluating an appropriate sentence.

**D.  A Probation Sentence Will Effectuate the Sentencing Goals Because of the Numerous Mitigating Factors**

Probation and the Government would be hard-pressed to argue that a probationary sentence would fail to correct Ms. Scott's behavior. She has never been to jail or prison, has never been convicted of any crime, and has a supportive family and community, employment skills, and a strong desire to work hard and make the most of her life.

15

LAW OFFICES
JAYNE LAW GROUP, P. C.
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111

1    The sentence proposed herein – not insignificant for someone like Ms. Scott – *is* a

2    pragmatic sentence which will serve the interests of deterrence, retribution and rehabilitation,

3    without a tremendous waste of resources and derailment of Ms. Scott's progress over the past few

4    years. Moreover, the end result after a probationary term is that Ms. Scott will forever face the

5    consequences of this conviction.

6        Ms. Scott recognizes that she was responsible for public safety, and that she breached that

7    trust when she unwittingly consented to letting her ex-husband's friend's bag pass through

8    security without scrutiny. His suspicious behavior led her to presume that there was a high

9    probability the bag contained drugs and not explosives. She should have given the bag a secondary

10   check, but for all the reasons explained herein – the favor, job efficiency, lack of training – she

11   neglected to do so. Such conduct, while offensive and regrettable, should not result in a custodial

12   sentence for Ms. Scott. Going to prison for this isolated action four years ago would be grossly

13   disproportionate to the conduct at issue.

14       Ms. Scott requests a 24-month departure from the recommendation by probation. By

15   comparison, this Court sentenced Bobby Napier to 48 months, a 22-month departure from the

16   sentence sought by the government. Mr. Napier's involvement was tenfold of Ms. Scott. He was

17   involved for a lengthy period of time, was aware of the drugs, benefited monetarily, and was right

18   in the middle of the operation. Ms. Scott isn't even in his ballpark and her minimal involvement is

19   reflected to some extent in the minor role adjustment in her plea agreement. Accordingly, a

20   probation sentence for Ms. Scott is entirely just and appropriate.

21       **E.  Proposed Sentencing Guidelines for 2017 Allow for Variance for First Offenders**

22       Another § 3553(a) factor which this Court may take into consideration is the United States

23   Sentencing Commission's proposed amendment and corresponding view of first offenders. Under

24   the Commission's analysis, Ms. Scott, with no prior arrests or any convictions, is truly a "first

25   offender." *See http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-*

26   *amendments/20161219_rf_proposed.pdf*. According to the Commission, recidivism is lowest in

27                                                                16                        Case No. CR 15-514 CRB
                                                                                           DEFENDANT'S SENTENCING MEMO

28

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 California Street, Suite 1001
SAN FRANCISCO, CALIFORNIA 94111

1 such first offenders. As a result, the proposed guideline section 4C1.1(a), along with the directive

2 in 28 U.S.C. § 994(j), instructs that a sentence <u>other than imprisonment</u> may be appropriate for a

3 first offender who has not been convicted of a crime of violence or an otherwise "serious offense."

4 In Ms. Scott's case, she could be entitled to a one-level decrease from the final offense level

5 pursuant to proposed § 4C1.1(a). While certainly not effective at the time of sentencing, the

6 Commission's analysis and attitude towards First Offenders can certainly be instructive in

7 determining the appropriate sentence for Ms. Scott.

8 **CONCLUSION**

9      Ms. Scott admits and knows far too well that it was irresponsible to have looked the other

10 way when she worked at airport security. She wishes she could go back in time and make better

11 choices. Ms. Scott is now asking this Court for a chance to continue to rebuild her life without

12 going to prison, to contribute to the community with 200 community service hours and attempt to

13 put back the pieces, despite what has been a nightmare ordeal for her and her loved ones.

14      The lengthier custodial term recommended by the Government and Probation conflicts

15 with the goals articulated in the sentencing statute designed to ensure than an offender successfully

16 rehabilitates and re-joins society as a fully functional and law-abiding citizen. Ms. Scott has

17 already proven herself to be a law-abiding citizen in the four years since the offense and the

18 nineteen months on pretrial supervised release.

19      As such, the defense respectfully requests that the court sentence Ms. Scott to a three year

20 term of probation, 200 hours of community service, *no* drug testing conditions (as she has never

21 abused drugs), and all other standard terms and conditions.

22      Respectfully Submitted,

23

24 DATED:  June 28, 2016           /jmj/

25                                     Julia Mezhinsky Jayne

26                                     Counsel for Jessica SCOTT

27         Case No. CR 15-514 CRB
DEFENDANT'S SENTENCING MEMO

28

LAW OFFICES
JAYNE LAW GROUP, P.C.
260 CALIFORNIA STREET, SUITE 1001
SAN FRANCISCO, CALIFORNIA 94111